**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 4 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CARLTON HUMPHREY; NANCY
REGAN,

      Defendants-Appellants.

Nos. 99-8001 &
99-8002

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. Nos. 97 CR-104-01-D & 97-CR-104-02-D)

---

David A. Kubichek, Assistant United States Attorney (David D. Freudenthal,
United States Attorney, with him on the brief), Casper, Wyoming, for Plaintiff-
Appellee.

Peter J. Young, Schwartz, Bon, Walker & Studer, Casper, Wyoming, for
Defendant-Appellant Humphrey, and G. Mark Garrison, Cody, Wyoming, for
Defendant-Appellant Regan.

---

Before **LUCERO, HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

Defendants/Appellants Carlton Humphrey and Nancy Regan were jointly indicted on one count of conspiracy to possess methamphetamine with intent to distribute, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, and one count of possession of methamphetamine with intent to distribute (and aiding and abetting the same), 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2. After trial together, both were convicted on both of those counts. The jury reconvened later and returned a verdict for the government on a forfeiture count, which does not concern us on this appeal. Each defendant filed a timely notice of appeal. We will consider the appeals together because there are several common issues.

**I**

**A**

The following summary of the trial evidence is, for the most part, taken in the light most favorable to the jury verdicts; at times, however, points raised by the defense will be mentioned to provide context for the analysis which follows, even though the jury was not convinced by the defense evidence.

In the spring of 1997, Alvin Bauerlein was terminally ill with cancer. Mr. Bauerlein lived on Jefferson Street in Casper, Wyoming, with his then fourteen year old daughter, Judith. Nancy Regan also lived in his home, where she took care of Mr. Bauerlein and did cooking and housekeeping. Carlton Humphrey, a friend of Regan, stayed at the house at times and was a frequent visitor. One Yno Martin, a

friend of Judith, also lived in the house for a few months in the summer of 1997, staying in the basement with Judith. Patricia Harris (later Patricia Bauerlein), known as Patty, became acquainted with Alvin Bauerlein through a cancer support group. Patty also eventually came to stay in the house on Jefferson Street.

In late May of 1997, Mr. Bauerlein was gravely ill and in the hospital. On May 29 Alvin and Patty were married in the hospital room. Patty then moved into the house on Jefferson Street, where she lived for a few weeks. Alvin Bauerlein died five days after the marriage. A few days after that, Regan was appointed Judith's guardian.

Judith Bauerlein had begun using methamphetamine in January or February, 1997. Testifying for the prosecution at trial, Judith said that she had been dealing methamphetamine during 1997, often having several thousand dollars in cash or several ounces of methamphetamine at a time. In mid-August, 1997 Judith was arrested and confined in a juvenile facility. Sometime in August Patty Bauerlein contacted Chuck Davis, who was an investigator with the Natrona County Sheriff's Department. Patty asked Davis to meet her at her mother's residence, where she had been living since late July, and he did so. Patty told Davis that Defendants Regan and Humphrey were dealing methamphetamine and that she wanted to put a stop to it because they were involving Judith in their activities. Patty continued to contact Davis about once a week for the following few weeks.

In late August, 1997 Patty contacted Davis with a specific tip. She said that Humphrey and Regan were going to Cheyenne to make a drug buy and gave a particular location where she believed they could be found. Officers in Cheyenne were unable to locate the Defendants that day, and Patty testified that she later learned that Defendants had gone to Denver instead of Cheyenne that day. On September 5 Patty again called Davis and reported that Humphrey had a large amount of methamphetamine in his possession and was in Casper, probably driving a green pickup. Officers were unable to find Humphrey that night.

On the morning of September 6, 1997 Patty called Davis again. She said that she and Judith were to meet Humphrey and Regan for breakfast at the Flying J truck stop in Casper. Several officers gathered near the truck stop and spotted Defendants leaving in Humphrey's green pickup. By this time, the police had determined that the pickup was registered to Humphrey, that he was driving under suspension, and that there was an outstanding warrant for his arrest. Police stopped the pickup with Humphrey and Regan in it after it left the truck stop. As the pickup was slowing down and pulling over, police saw defendant Regan ducking down and moving as if she were moving something on the floorboard of the pickup. When Humphrey produced his identification he was arrested on the outstanding warrant. He was handcuffed and placed in a patrol car. The officers searched Humphrey's pockets and found $3,492 in cash, as well as a money order for $500.

While Humphrey was being arrested and searched, another officer asked Regan to get out of the pickup and talked with her. In the meantime, other officers found a tan satchel in the floor of the pickup on the passenger side. Opening the satchel, they found two large bags containing what they believed to be, and what was later proven to be, methamphetamine totaling over 600 grams. Regan was then arrested. Subsequent search revealed a small quantity of methamphetamine, about 3 grams, in her purse (the first purse). She had only a small amount of cash. The pickup was impounded and taken to the police station, where it was thoroughly searched. Small additional amounts of drugs were found, along with some drug paraphernalia.

Patty had also told Davis that Humphrey had left his Dodge automobile in the garage at Patty's mother's house, where she was staying. Immediately after the arrest of the Defendants, the officers sought a search warrant for the Dodge. Patty, Judith, and Yno Martin had witnessed the arrests. They went from there to Patty's mother's house, where they destroyed small amounts of drugs, and Judith removed some photos from the Dodge. About forty-five minutes later, officers arrived to secure the location pending issuance of the requested search warrant.

The warrant was issued and the Dodge was searched later that day. The trunk of the car contained, *inter alia*, another $4,000 in cash, a loaded pistol, and a notebook with handwritten numbers and notations. The notebook was admitted in evidence at trial, and was said in expert testimony to be a drug ledger. Patty

Bauerlein identified the handwriting in the notebook as that of Defendant Regan. In addition to searching the car, the police looked through some items that Patty had identified as belongings of the defendants; nothing incriminating was found in these items.

About a month later, Patty called Davis to report that she had found something which might be evidence in the case. Davis went to Patty's residence and she gave him a purse which she said belonged to Nancy Regan (the second purse). The second purse contained documents which were admitted at trial and, like the notebook found in the trunk of the Dodge, identified as records of drug transactions. Davis testified that he was no longer working on the case at that point and that he took the purse back to his office and forgot about it. The purse remained in or on his desk for several weeks, perhaps as long as two months, before he notified anyone else that he had obtained it. The purse was later opened and the documents already described were found. [1]

**B**

Defendants filed motions to suppress the documents found in the second purse, and Humphrey also moved to suppress all evidence seized at the time of his arrest. Defendants argued that the seizures violated their Fourth Amendment rights. The district court denied the motions and these rulings premise several arguments we

---

[1]Other inculpatory evidence, primarily from testimony of Patty Bauerlein and Judith Bauerlein, will be discussed *infra* in our analysis of the issues.

consider in Part III, *infra*.

A first attempt to try Humphrey and Regan was aborted when during *voir dire* one of the prospective jurors made a remark about Humphrey's reputation in front of all the panel. A new trial was granted. Defendants were convicted in that trial.

## II

The Defendants present several claims of error as grounds for reversal and a new trial. One of the most troubling is their assertion of juror misconduct and prejudicial taint of the jury. About three months after trial, Defendants asked the judge to investigate an allegation of juror misconduct. Regan's lawyer had heard, indirectly, that one of the jurors had said that another juror had brought up something about Humphrey's reputation during deliberations. The attorney was eventually able to contact the first juror, whom we will refer to as Juror #1, who gave him essentially the same information that the attorney had first received.[2]

At that point, the attorney notified the court by a May 12, 1998 letter and an investigation of the allegation by the judge began. *See* n.4, *infra*. At the first of two hearings to investigate these allegations on June 30, 1998 Juror #1 testified that Juror #2 said, "Oh, my God, I live in Douglas, and I even know the Humphreys'

---

[2]The trial judge caused proceedings on this claim to be protected from disclosure by having them in chambers, with only counsel present, and by having transcripts of the proceedings sealed. For similar reasons we will refer to the jurors by numbers or as the foreperson of the jury.

reputation."[3] After hearing Juror #1's testimony the judge remarked that according to his memory, there had been only one juror from the town of Douglas. The judge confirmed with the court clerk that the court's records would enable them to identify Juror #2. The judge then stated his intention to identify Juror #2 and to have that juror and another juror appear for further inquiries in the presence of the parties. He said, "I'll ask the clerk of court to contact these individuals and make a time for them to come in and see me as soon as possible." XV R. 14. The judge also ordered all counsel not to make any more contacts with members of the jury.

The judge himself later contacted (without participation by counsel) the foreperson of the jury whom he wished to question to arrange an appearance at a second hearing held on August 10, 1998. The foreperson testified at that hearing that there was no statement made by a juror about Mr. Humphrey's reputation. Since being contacted by the judge, the foreperson had searched his memory but no such remark was recalled. After that testimony, the judge stated that he was convinced by the foreperson's testimony that there was nothing to the allegation of a remark having been made about Humphrey's reputation. XVI R. 17. The Defendants' renewed motion for a new trial was denied and the judge turned to sentencing the Defendants.

---

[3]Inquiry here was limited to whether the jury had been exposed to extraneous information regarding the reputation of Humphrey in the community, and there was no effort to explore the possible effect on the jurors of that extraneous information, an area that is strictly off limits under Fed. R. Evid. 606(b).

The reported remark about Humphrey's reputation by Juror #2 underlies two claims of error. First, both Defendants argue that restriction of the investigation of the alleged prejudicial remark concerning Humphrey's reputation by a juror during deliberations was error, requiring reversal. Appellant Nancy Regan's Brief at 32-35; Brief of Defendant-Appellant Humphrey at 27. Second, Regan argues that the direct contact by the judge, without counsel's knowledge, with the foreperson of the jury requires reversal or at least remand to determine the nature and extent of the direct communication and its effect on Regan's trial. Appellant Nancy Regan's Brief at 40.

We are persuaded that both cases must be remanded for further proceedings and findings on these issues and for the judge's determination as to an adequate remedy to insure that the Defendants' rights to a fair trial were not infringed. We turn now to these issues.

**A**

*First*, we will consider questions arising from Juror #1's testimony about an alleged remark concerning the Humphreys' reputation. Regan argues that the trial judge abused his discretion in failing to investigate adequately the possibility that Juror #2 from Douglas may not have responded honestly during *voir dire* examination and thereby concealed having unfavorable information about Humphrey and potential bias against Humphrey; and that the judge abused his discretion by failing to investigate adequately the possible injection of extraneous considerations

in the jury deliberations.

How and whether to have a hearing on a claim that jurors were improperly exposed to extraneous information is within the trial court's sound discretion. *See United States v. Davis*, 60 F.3d 1479, 1483 (10th Cir. 1995). We agree with the Sixth Circuit that "the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated." *United States v. Rigsby*, 45 F.3d 120, 125 (6th Cir. 1995). Neither Defendant asserts error in the court's decision to control the investigation by having proceedings *in camera* and by barring direct contacts by the attorneys with the jurors. The district judge took this matter seriously, declaring his intention to "do what has to be done here to ferret out the truth . . . ." Nevertheless, we are convinced that we must remand these cases for further proceedings in the trial court on these matters concerning possible jury taint as explained below. We will, therefore, outline general guidelines for the investigation, consideration and disposition of claims such as are presented here.

We agree with the district judge that the matters presented to him required investigation here. We must decide whether the judge abused his discretion by limiting his investigation and the scope of his findings as he did. Our conclusion that the judge erred is based on the mandate that "the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated." *U.S. v. Rigsby*, 45 F.3d 120, 125 (6th Cir. 1995).

-10-

At the conclusion of the hearing of August 10, 1998, where the foreperson of the jury was questioned by the judge and counsel, the judge concluded that the only issue that was presented to the court was: "[W]as there a conversation in the presence of all the jurors about the fact that some juror knew the reputation of the Humphreys." XVI R. 13-14. The judge said that the fact that two people might have had a conversation outside the presence of all the other jurors was not something he was going to delve into; the question was what was said in the presence of all the jurors. The judge found that the person who had the best recollection of these events was the foreperson of the jury who had testified, and the judge said he was satisfied the foreperson had a good reputation and memory and was not someone who would conceal information from the court under oath. *Id.* at 14. The foreperson testified that "as far as reputation, no. There – there – nobody in there said anything about any of the reputations. . . . . I would have remembered if something like that were said; and as far as 'their reputation,' those words never come [sic] out of any juror's mouth." *Id.* at 7-8. The judge then concluded:

> I'm convinced by [the foreperson's] testimony. I'm convinced that there is nothing to the allegation and I'm going to proceed to sentence the defendants without any additional delay.

*Id.* at 14.

We hold that the judge abused his discretion in cutting off the investigation and his findings as he did. He had heard the testimony of Juror #1, in the June 30, 1998

hearing where the judge and counsel questioned that juror. During that hearing the judge said that he had received a letter from counsel for Regan concerning Juror #1; that counsel had written the judge on May 7, 1998, reporting that he had spoken to a juror in the case about information that counsel had received from an inmate at a correction center. XV R. at 4-5. In the hearing the judge addressed Juror #1 because counsel's letter indicated that counsel had spoken with the juror about whether someone on the jury knew Regan or Humphrey. The letter said it was reported that Juror #1 heard someone say: "Oh, come on, you guys know the Humphrey reputation around here," and that there was apparently some acknowledgment of this by another juror. According to the letter the foreperson then reminded everyone that this matter could not be discussed. *Id.* at 5-6. At the June 30 hearing Juror #1 told the judge there was a juror who "[k]new of Humphrey's reputation. They did not say good or bad." *Id.* at 6. Juror #1 said that the other juror had exclaimed "Oh, my God, I live in Douglas, and I even know the Humphreys' reputation." *Id.* Juror #1 said that the fellow juror, whom we will refer to as Juror #2, had said "[O]h my God, they didn't testify to that. You want him out selling drugs to your daughter?" *Id.* at 9.

Thus, we know that the trial judge had evidence before him that Juror #1 had reported statements by Juror #2 from Douglas indicating knowledge of the reputation of the Humphreys. This raises the serious question whether Juror #2 from Douglas had failed to reveal, on *voir dire*, having knowledge about defendant Humphrey and

-12-

bias concerning him. The judge had information from counsel for Defendant Regan reporting that Juror #1 was shocked by the remark concerning knowledge of the Humphrey reputation, that Juror #1 then went to have a cigarette, and that a Juror #3 also came out with Juror #1. The two of them wondered whether they should come to the judge with this development but thought they were not supposed to do so. Letter dated May 12, 1998 from Counsel Garrison to the district judge. [4]

In light of the information before him from Juror #1, and the identification of Juror #3, who was said to have discussed with Juror #1 the alleged remark by Juror #2 about the Humphreys' reputation, we are convinced that it was error to cut off the investigation as was done. [5] The judge instead relied on the foreperson's testimony, without developing other evidence to make findings as to the alleged statement by Juror #2 from Douglas concerning the Humphreys' reputation. The record shows no development of the knowledge of Juror #3 about these critical circumstances. Our gnawing concern is increased by wondering what the judge might have found if he heard the testimony of Juror #3 and the important Juror #2 from Douglas. The Douglas juror's testimony is not only critical about possible taint of the jury panel, but also as to whether the juror may have harbored bias against Humphrey and failed

---

[4]Defendants' joint motion to supplement the record, which is unopposed, is granted. The May 12, 1998 letter, cited in text, appears in that supplemental record.

[5]We note that at the August 10, 1998 hearing, counsel for Humphrey favored calling Juror #3 for questioning. XVI R. at 13.

to reveal it on *voir dire* .

In sum, cutting off the investigation and limiting the findings to the determination that there was nothing to the allegation about the juror's remarks concerning Humphrey's reputation, without developing such further evidence, was an abuse of discretion.

**B**

We have examined the transcript of the August 10, 1998 hearing before the judge. At this hearing the foreperson of the jury was questioned, with government counsel and counsel for both Defendant Humphrey and Defendant Regan participating. (Mr. Garrison, counsel for Regan, participated by telephone.)

During that hearing, the judge related in detail information obtained from Juror #1 and also the fact that the judge had contacted the foreperson to arrange his appearance for a hearing; and the judge also had asked the foreperson to spend careful time reflecting on the possibility of a juror's statement concerning the reputation of Humphrey. XVI R. 7-8.

Although the contact by the judge with the foreperson of the jury became known to all counsel at the time of the August 10, 1998 hearing, there was no objection or motion for relief based on that contact at the time the contact became known. It was not until a motion for reconsideration (filed September 30, 1998, Supp. R.) of the denial of a motion for a new trial that the judge's contact with the

foreperson of the jury was cited as a reason for a new trial. This delay meant that the judge and counsel for the parties were unable to develop any additional facts about the contact at the August 10, 1998 hearing when the foreperson was present at that hearing. Therefore we are satisfied that the contact by the judge with the foreperson of the jury was waived as an appellate issue.

## C

In sum, we remand for further proceedings and findings on the jury taint claims. At this juncture we feel we should not order a new trial for the Defendants. However, in light of the evidence before the trial judge tending to support allegations of jury taint  (on the furnishing of extraneous information to the jurors such as on Humphrey's reputation, on the possibility that a juror failed to respond honestly on *voir dire*  about the juror's knowledge of information about a party or parties in the case, and on possible bias against a party or parties in the case)  the trial judge should develop the facts by hearings such as were conducted here, but were cut off without getting information from Juror #3 who was said to have discussed the reputation remark with Juror #1, or importantly from Juror #2 from Douglas. The trial judges in such circumstances should conduct hearings, consider the evidence that the court and counsel develop in such hearings, and then make findings on the allegations of jury taint. These procedures should, as this trial judge conscientiously said, "do what has to be done here to ferret out the truth."

Based on such hearings, investigation and findings, the trial judges should exercise their sound discretion, as can be done on remand here, to determine whether a new trial must be ordered or whether the verdicts rendered may stand because the Defendants' constitutional right to a fair trial was not infringed.[6] On the basis of these further investigations and findings, the trial judge should determine whether the verdicts should stand or a new trial should be ordered.

## III

We will now consider the remaining claims of error. In the event the judge determines that a new trial is required, these further rulings will have been made to dispose of these issues for those proceedings.

## A

Defendant Humphrey challenges the denial of his motion to suppress the evidence seized from his pickup truck at the time of his arrest. Humphrey challenges the district court's ultimate ruling, not its underlying findings, and thus our review is *de novo*. *See United States v. Anderson*, 114 F.3d 1059, 1063 (10th Cir. 1997). In

---

[6]If the judge after further investigation determines that a juror made the alleged statement about the reputation of the Humphreys, the judge should consider whether the Defendants are entitled to a new trial on the basis of that juror's actual or implied bias, *see McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984); *United States v. Carat-Reyes*, 176 F.3d 1253, 1258-61 (10th Cir. 1998); *Gonzales v. Thomas*, 99 F.3d 978 (10th Cir. 1996), and whether the presumption of prejudice from the injection of extraneous matters into the jury deliberations is overcome by the government, *see Davis,* 60 F.3d at 1484-85; *Mayhue v. St. Francis Hospital*, 969 F.2d 919, 922 (10th Cir. 1992).

denying Humphrey's motion, the trial judge indicated that the warrantless search of the pickup was proper under either of two theories: the so-called automobile exception to the requirement of a search warrant, which permits search of a stopped vehicle on a showing of probable cause; [7] and a search of a vehicle incident to a lawful arrest. IV R. 32-35. On appeal, Humphrey challenges both grounds relied on to justify the search. Because we hold that the search of the vehicle was proper as a search incident to a lawful arrest, *see United States v. Lacey*, 86 F.3d 956, 971 (10th Cir. 1996), we do not consider the probable cause argument.

Under *New York v. Belton*, 453 U.S. 454, 460-61 & n.4 (1981), officers may search any containers, open or closed, in the passenger compartment of a vehicle incident to a lawful arrest of an occupant of the vehicle. Nevertheless, Defendant Humphrey argues that this rule has now been modified by *Knowles v. Iowa*, 525 U.S. 113 (1998). Brief of Defendant Humphrey at 17-20. Defendant's reading of that case is mistaken, however. The Court in *Knowles* instead held that the Fourth Amendment does not permit a search incident to citation, while leaving the rule of *Belton* intact. *Id*. at 118.

Defendant argues that neither of the concerns underlying the rule of *Belton*, officer safety and preservation of evidence, was present in this case. The former was not implicated once he had been taken into custody without resistance, handcuffed,

---

[7]*See, e.g., Anderson*, 114 F.3d at 1065.

and placed in the squad car, he contends. He also asserts that because the outstanding warrant was for driving under suspension, there was no likelihood that evidence relevant to that offense would be found in the vehicle. He notes that the Court in *Knowles* based its holding in part on the somewhat reduced concern for officer safety in the context of an ordinary traffic stop and the absence of the concern for preservation of evidence of the traffic violation there. We disagree because *Belton* emphasized that its holding created a "bright line" rule, intended to provide specific and coherent guidance to officers in the field. Therefore, this search is valid under *Belton* without regard to the fact that the search occurred after Defendant had been restrained, *see United States v. Lacey*, 86 F.3d at 970-71, and without regard to the nature of the offense for which he was arrested, *see United States v. McKinnell*, 888 F.2d 669, 672-73 (10th Cir. 1989). [8]

We cannot agree that *Knowles* has abrogated *Belton*. We think the Court made it clear that it harbored no such intention. *Knowles*, 525 U.S. at 118 (citing *Belton* with approval); *see also United States v. McLaughlin*, 170 F.3d 889, 894 (9th Cir. 1999). Accordingly, there was no error in denying the motion to suppress evidence

---

[8]As one circuit judge has lucidly and emphatically demonstrated, cases like the instant case (when we focus only on the search incident to arrest rationale and not the probable cause justification for this search) demonstrate that the legacy of *Belton* is that "the rationales behind the search incident to arrest exception have been abandoned, the purpose has been lost," and as other cases have shown, even the supposed clarity of the bright line rule has proved illusory as "little certainty remains." *United States v. McLaughlin*, 170 F.3d 889, 894 (9th Cir. 1999) (Trott, J., concurring). *See also* 3 Wayne R. LaFave, *Search and Seizure* § 7.1(c) (3d ed. 1996).

seized from Defendant Humphrey's pickup truck.

**B**

Both Defendants challenge the admission of evidence from the "second purse," as we label it for convenience. The primary contents of the second purse, at least the pages in the record on appeal, were a few pages of handwritten notes. In addition, the second purse contained a money order receipt which was admitted at trial as Government Exhibit 901. The government does not argue on appeal that any reasonable expectation of privacy in the second purse was destroyed by Regan's decision to leave it at Patty's house; we therefore presume that Regan did have a reasonable expectation of privacy.

The attack on this evidence has three prongs. First, Defendant Regan argues that Patty Bauerlein was acting as a government agent when she examined the contents of the second purse before turning it over to Officer Davis. [9] Second, Regan contends that, if Patty Bauerlein did not examine the contents of the second purse, then the later, warrantless search by the police violated her Fourth and Fourteenth Amendment rights by exceeding the scope of the "private search" by Patty. Third, both Defendants attack the evidence on the basis of lack of foundation; in connection with that argument, both Defendants assert that this evidence was inherently unreliable due to the failure to maintain a proper chain of custody.

---

[9] As discussed *infra*, there is a disparity in the evidence as to whether Patty Bauerlein did inspect the contents of the second purse.

**1**

We begin with Defendant Regan's argument that Patty Bauerlein was acting as an agent for law enforcement authorities when she examined the contents of the second purse. The first two parts of this attack on the evidence found in the second purse are presented in the alternative. Regan argues that if Patty first examined the contents of the purse before giving it to Officer Davis, she did so as a *de facto* agent for the government. Alternatively, she argues that if Patty turned the purse over to the authorities without examining its contents, then the search by the police without a warrant was improper under the Fourth Amendment because no exigency for proceeding without a warrant was shown and the search by the police would have exceeded the scope of any "private search" by Patty.

It is clear that the Fourth Amendment does not apply to searches by private parties, absent governmental involvement. *See United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996). There we explained that

> in some cases a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment "if the government coerces, dominates or directs the actions of a private person" conducting the search or seizure. *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir. 1989). In such a case, the private citizen may be regarded as an agent or instrumentality of the police[,] and the fruits of the search may be suppressed.

84 F.3d at 1242. Although the ultimate question of constitutional law is one we review *de novo*, the district court's determination whether the private citizen was

acting as an agent for the government is a factual finding to be reviewed only for clear error. *See United States v. Leffall*, 82 F.3d 343, 347 (10th Cir. 1996). The district judge determined that Patty Bauerlein was not acting as a government agent. IV R. 32 ("The suggestion that this individual became an agent of the police is not supported by the evidence presented to the Court."). We find no error in this ruling and so must reject this argument.

Regan essentially resorts to asking us to draw an inference of Patty's working as a government agent from the evidence of the working relationship between Patty and Officer Davis in the time leading up to the arrests. The district court did not draw that inference, and we cannot say that this was error.

**2**

Ms. Regan argues in the alternative that if Patty had not examined the contents of the purse prior to giving it to Officer Davis, then the later warrantless search of the contents by the police violated her Fourth Amendment rights. *See United States v. Jacobsen*, 466 U.S. 109, 115-16 (1984) (legality of warrantless police search following private search is determined by the scope of the initial private search); *United States v. Donnes*, 947 F.2d 1430, 1435 (10th Cir. 1986) (holding that police violated defendant's Fourth Amendment rights by opening camera lens case which private citizen had found in defendant's residence).

We agree with the government that this issue was not raised in the district court

and that our review is accordingly limited.  Both in his affidavit and in his testimony at the reconvened hearing on the motion to suppress, Officer Davis indicated that, at the time he received the purse from Patty, she told him that the papers in the purse might prove to be important evidence.  Based on Davis's statements, Defendant Regan relied  at the suppression hearing on the belief that Patty had examined the contents of the purse before turning it over to Davis, and argued for suppression on the basis (which we have considered *supra*) that Patty was acting as a government agent.  At trial, however, Patty testified that she had *not* examined the contents of the purse.  IX R. 709.

In *United States v. Parra*, 2 F.3d 1058 (10th Cir. 1993), we held that "unless a party asks the district court to reconsider its decision at trial, . . . we will not consider trial evidence which undermines a district court decision rendered at a pretrial suppression hearing."  2 F.3d at 1065.  Regan asserts that this rule is inapplicable here because she did renew her motion to suppress at trial.  We find this unavailing, however, because Regan never argued to the district court that the police search exceeded the scope of the private search (if any).  Thus, although *Parra* read literally requires only that the motion to suppress be renewed, we think it beyond argument that where, as here, the trial testimony arguably supports suppression of the evidence *on a legal basis different from that argued in the motion to suppress*, the defendant must object at trial and *inform the trial court of the new legal basis for*

*excluding the evidence* .

This corollary to *Parra* is but a specific application of the general rule that an issue must be presented to the district court to be properly preserved for appeal and is, of course, necessary to implement the underlying rationale of that case, that "the district court should have the first opportunity to correct its mistake." 2 F.3d at 1065. Here there was no mistake by the district court. Its ruling at the suppression hearing that Patty was not acting as a government agent was, as we have discussed, not error. Patty's testimony at trial that she had not opened the purse provided the basis for a potential argument, advanced here, that the police should have obtained a warrant before their examination of the contents, but that argument was not made below. The district judge did not err in failing to consider this issue *sua sponte* .[10]

**3**

Both Defendants contend that the district court abused its discretion in admitting the documents from the second purse because the sole evidence to identify the handwriting on the exhibits was questionable testimony of Patty Bauerlein.[11]

---

[10]As we noted in *Parra* , we will review the admission of evidence for plain error: "Of course, if the trial evidence is of such a nature that the district court should have immediately realized that its earlier ruling was in error, we may consider the evidence because the district court's failure to act *sua sponte* would then be plain error." 2 F.3d at 1065. We do not find the evidence here to be of such a character and hold there was no plain error.

[11]Defendants acknowledge that lay witnesses may be competent to testify as to the source of handwriting "based on familiarity not acquired for purposes of the

(continued...)

Patty testified that she was familiar with Defendant Regan's handwriting, adding that Regan kept notes "about everything and everybody." IX R. 710, 714. She also testified that she was familiar with Defendant Humphrey's signature, which she identified on one exhibit, a money order receipt. *Id*. at 713. Although it is true that there was almost no elaboration on the opportunities that Patty had to observe the Defendants' handwriting, especially as to Humphrey, we do not believe that the district judge abused his discretion in admitting the evidence based on this foundation.

Defendants also assert that the documents from the second purse should not have been admitted because of the officers' failure to maintain a proper chain of custody. As noted, rather than transferring the purse to a secured evidence room, Officer Davis kept the purse unsecured in his office for several weeks without examining the contents. We conclude, however, that the district judge properly decided that the irregularities in the handling of this evidence did not preclude its admission but could be considered by the jury in its determination of the weight to be given to the evidence.

As the government points out, these documents were unlike fungible evidence, such as drugs or cash, where absent a reliable chain of custody there would be a relatively high risk that the original item had been contaminated or tampered with.

---

[11](...continued)
litigation." Fed. R. Evid. 901(b)(2).

If a proffered exhibit "is unique, readily identifiable and relatively resistant to change, the foundation need only consist of testimony that the evidence is what its proponent claims." *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989); *see also Reed v. United States*, 377 F.2d 891, 893 (10th Cir. 1967). The exhibits at issue here are unique and relatively resistant to change.

Because it is not clear that anyone had looked at these documents before they spent weeks in Officer Davis's desk, we cannot say that the documents were readily identifiable, but we think the trial judge did not abuse his discretion in determining, based on Davis's testimony, that the evidence was "what its proponent claims." *Cardenas*, 864 F.2d at 1531. The chain of custody need not be perfect. *United States v. Johnson*, 977 F.2d 1360, 1367 (10th Cir. 1992). Where the chain of custody is imperfect, "deficiencies in the chain of custody go to the weight of the evidence, not its admissibility; once admitted, the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence." *Cardenas*, 864 F.2d at 1531.

Defendant Humphrey also argues that it was error to admit these documents against him, [12] claiming that Patty Bauerlein was an uncharged accomplice and her testimony providing the foundation for admission of these documents was therefore presumptively unreliable. Humphrey analogizes to the rule that out of court

_____

[12]In addition to the documents found in the second purse, this argument is directed to a document, identified as a "drug ledger," which was found in the search of the Dodge that was parked in Patty's garage.

confessions of accomplices or co-conspirators are presumptively unreliable because they "'may well be the product of the co-defendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.'" *Crespin v. New Mexico*, 144 F.3d 641, 646 (10th Cir. 1998) (quoting *Lee v. Illinois*, 476 U.S. 530, 545 (1986)). This rule, however, is rooted in the Confrontation Clause of the Sixth Amendment and applies where the co-defendant does not testify at trial. Here, Patty *did* testify at trial and was subject to cross-examination.

We do not understand Humphrey to direct this argument to the underlying statements of Regan contained in the documents. If that is intended, we are still unconvinced. The statements made by Regan in the documents, unlike the confessions referred to in *Crespin*, were not made while in custody or under investigation. Therefore, the danger that Regan was trying to shift the blame from herself, *see Crespin*, 144 F.3d at 646, when she made the notes is simply not substantial, and the principle invoked by Humphrey is inapplicable.

## IV

Regan contends that the district court made two errors in charging the jury – failing to instruct on her theory of defense and failing to instruct on the lesser included offense of simple possession.

## A

Regan's theory of defense, as suggested by counsel in closing statement,

essentially is that Patty Bauerlein was not merely a user of methamphetamine but an addict; that Patty was motivated by her need for money to support her habit which overwhelmed all other considerations; that Judith Bauerlein was entitled to Social Security survival benefits; and that Patty therefore wanted to displace Regan as Judith's guardian to obtain control over those funds.

Regan submitted three instructions on the Wyoming law of intestate succession and the right of a surviving spouse to an elective share of the decedent's estate in lieu of taking under the decedent's will. The proposed instructions quoted Wyoming Statutes §§ 2-5-101(a), 2-5-103 and 2-4-101(a). Our standard of review is *de novo* to determine "whether the instructions as a whole adequately apprised the jury of the issues and the governing law." *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998). Although it is reversible error not to instruct the jury on a theory of defense that is supported by the evidence, such an instruction "is not required if it would simply give the jury a clearer understanding of the issues." *Id.*

We hold that the district court did not err in refusing to give the proffered instructions. First, we think it clear that the instructions as given adequately stated the applicable law and gave the jury a clear understanding of the issues. The jurors were specifically instructed that Patty Bauerlein was an informant whose testimony "must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated." Instruction 14, II R. doc. 126. The instruction

went on to say that the jury "must determine whether the informant's testimony has been affected by self-interest . . . or by prejudice against the defendants." *Id.*

This instruction adequately framed the issues and provided the necessary basis for consideration of Regan's defense. From our review of counsel's closing argument, we are confident that there was no inhibition affecting presentation of the defense, which was argued by counsel for Humphrey as well as by Regan's attorney. *See, e.g.*, XI R. at 1029, 1040. The proffered instructions, on the other hand, might not have been comprehensible to the jurors. As the government points out, the statutes quoted in Regan's requested instructions include terms such as "elective share," "homestead allowance," "enforceable claims," "exempt property," "family allowances," "parcenary," and "intestate." We do not believe that the esoteric instructions would have been helpful, much less that they were necessary for the jurors to understand the Defendant Regan's theory.

**B**

Regan also claims error in the district judge's decision not to instruct the jury on the lesser included offense of simple possession of methamphetamine. Regan argues that the jurors could have found her guilty of possessing only the small amount of methamphetamine which was found in her purse when she was arrested, while finding her not guilty of Count Two, possession with intent to distribute, which was based on the much larger amounts of methamphetamine recovered from the satchel

-28-

found in the floor of the pickup at the time of Defendants' arrests. [13]

We apply a four part test to determine when a lesser included offense instruction should be given. First, the defendant must properly request the instruction; second, the elements of the lesser included offense must be a subset of the elements of the charged offense; third, the element required for the greater, charged offense that is not an element of the lesser offense must be in dispute; and fourth, the evidence must be such that the jury could rationally acquit the defendant on the greater offense and convict on the lesser offense. *See United States v. Duran*, 127 F.3d 911, 914-15 (10th Cir. 1997). We review *de novo* whether the "offense for which an instruction is sought actually qualifies as a lesser included offense of the offense charged," but we have said that the district court's decision "as to whether there is enough evidence to justify a lesser included offense instruction [is reviewed] for an abuse of discretion." *Id.* at 914. This however, is no broad ranging discretion but is focused narrowly on whether there is any evidence fairly tending to bear on the lesser included offense. In *Duran*, we continued our analysis by recognizing that: "The Supreme Court has held *a defendant is entitled to an instruction concerning a lesser crime*, pursuant to Fed. R. Crim. P. 31 (c), if the evidence justifies that instruction." *Id*. (emphasis added).

---

[13]Regan did not request a lesser included offense instruction with respect to the conspiracy count. Possession is not a lesser included offense of conspiracy to possess with intent to distribute. *See United States v. Lacey*, 86 F.3d 956, 969 n.11 (10th Cir. 1996).

In *United States v. Pino,* 606 F.2d 908 (10th Cir. 1979), we explained the operation of Rule 31(c) and its provision that a defendant "may be found guilty of any offense necessarily included in the offense charged," or of an attempt to commit that offense if the attempt is an offense. We held that

> [a]lthough the language is in discretionary terms, it is *"mandatory in the sense that if there is evidence to support a lesser included offense and defendant requests such a charge, the court has no discretion to refuse to give the instruction."* 8A *Moore's Federal Practice,* par. 31.03.

606 F.2d at 914 (emphasis added). The Supreme Court has noted that

> [i]n the federal courts it has long been "beyond dispute that the defendant *is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater."*

*Beck v. Alabama*, 447 U. S. 625, 635 (1980) (emphasis added)(quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)). The Court also noted agreement in all of the States with this principle. *Beck,* 447 U.S. at 635-36 & nn.11 & 12. This principle was recognized over a century ago in *Stevenson v. United States*, 162 U. S. 313 (1896):

> A judge may be entirely satisfied from the whole evidence in the case that the person doing the crime was actuated by malice; that he was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; *and yet if there be any evidence fairly tending to bear upon the issue of manslaughter,* it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter.

162 U.S. at 323 (emphasis added).

We are convinced that refusal to give the requested instruction of Defendant Regan here on simple possession was a legal error and an abuse of discretion under this principle. The government argues that the amount of methamphetamine found in the satchel is such that the jury could not have acquitted her on the charge of possession with intent to distribute. However, we note that as to the satchel, which was Government's Exhibit 1 at trial, the evidence was that Humphrey had been seen carrying a satchel of similar appearance on the morning of his arrest. VIII R. 333-38; 366-69. Moreover, Patty Bauerlein testified that Humphrey habitually carried a satchel which he called his "dope bag," although she believed that the one she had seen was not the same one as Exhibit 1. IX R. 647-48. Judith Bauerlein testified that Humphrey borrowed her scales three or four times to weigh one pound quantities of methamphetamine and that after weighing the drug and dividing it into smaller quantities, he would put all the bags into a tan bag like Exhibit 1. *Id.* 577-81. Thus, the evidence tied the satchel much more closely to Humphrey than to Regan.

The trial judge relied on testimony that Regan was seen moving something on the floorboard of the pickup as Humphrey was slowing the pickup to a stop in response to the officers' signals, drawing the inference that Regan was moving the tan satchel. Although this inference, and the further inference that such an act would indicate guilty knowledge as to the contents of the satchel were perhaps permissible, we cannot agree that the jury could only have drawn such inferences, especially in

light of testimony that other objects were in the floorboard of the pickup at the time.

Our question is not whether the evidence pointing to the lesser offense of simple possession was weak. "Under settled principles . . . a defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, *'however weak' that evidence may be."* *United States v. Thornton*, 746 F.2d 39, 47 (D.C. Cir. 1984)(emphasis added). Nor is it controlling that the jury might have had to credit part of Judith Bauerlein's testimony and discredit much of it in order to reach that result since

> the court may not intrude on the province of the jury which may find credibility in testimony that the judge may consider completely overborne by the simply overwhelming evidence of the prosecutor. And there may be some evidence of a lesser offense *even though this depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other points in dispute.*

*Belton v. United States*, 382 F.2d 150, 155 (D.C. Cir. 1967) (citations and internal quotation marks omitted)(emphasis added).

Regan points out that the jury could have decided to hold her responsible merely for a possession violation in view of the small amount of methamphetamine found in her purse, 3.81 grams, when she was arrested. IX R. 546-47. And we note particularly that one of the officers testifying for the government, the Supervisor of the street drug unit of Casper, Officer Clapp, testified that this quantity of methamphetamine found in Defendant Regan's purse was *"indicative of somebody*

*who is a user . . . along with the other items found in the purse . . . ."* *Id*. at 550. *See also* IX R. 546-47, 549 (emphasis added). There was also other evidence that Regan was using methamphetamine. *Id*. at 571-72, 576. *See generally U. S. v. Moore*, 108 F.3d 270, 273 n.2 (10th Cir. 1997)(collecting cases reversing drug convictions for failure to give instructions on lesser included offenses of simple possession).

Moreover, the evidence in the case implicated Humphrey more strongly than Regan.[14] While the jury might have found that Regan possessed the drug in the satchel, our inquiry, as we are instructed by the Supreme Court in *Stevenson v. United States*, 162 U. S. at 323, in *Beck*, 447 U. S. at 635, and in *Keeble*, 412 U. S. at 208, is whether "the evidence *would permit a jury rationally to find [her] guilty of the lesser offense and acquit [her] of the greater...*" *Beck*, 447 U.S. at 635 (emphasis added). Here we are convinced the evidence was such that the submission of the lesser-included-offense charge was decided erroneously.

On this record, and in light of the teachings of the Supreme Court on the Defendant's right in such a jury trial to such a charge where there is "any evidence" to support submission of the lesser-included-offense instruction, the rejection of the charge was error, requiring that Regan's conviction on Count II be reversed.

## V

Both Defendants challenge two of the decisions made by the district court in

---

[14]Some of this evidence is discussed in parts V-A and V-C, *infra*.

the application of the Sentencing Guidelines. Both Defendants contend that the district judge erred in calculating the amount of methamphetamine for which the Defendants should be held responsible and by increasing their offense levels for the use of a firearm in connection with the offenses. Additionally, Humphrey alleges that the court erred in increasing his offense level for the use or involvement of a minor in the offenses.

**A**

Both Defendants challenge the calculation of the amount of methamphetamine attributed to them for sentencing purposes. The government contended at the sentencing hearings that the amount of methamphetamine to be attributed to the Defendants could be conservatively estimated at 7.5 kg. The government must prove drug quantities at sentencing by a preponderance of the evidence. The Defendants' challenges to these calculations raise issues of fact; we review the district court's factual findings only for clear error. *E.g., United States v. Clark*, 57 F.3d 973, 977 (10th Cir. 1995).

At the sentencing hearings, the government offered the testimony of Officer Wenberg, who gave virtually identical testimony in each case as to the calculation of the quantity of methamphetamine which could be attributed to the Defendants. Some of Wenberg's testimony was based on his own study of the drug ledgers discussed *supra*, some was based on trial testimony of other witnesses, and some was based on

information disclosed during the investigation of the case, especially interviews by the prosecuting attorney with Patty Bauerlein in which Officer Wenberg had participated.

First, the government relied on the trial evidence that approximately 665 grams of methamphetamine were found in the tan satchel at the time of the Defendants' arrest, along with 85.59 grams of amphetamine. Under the drug equivalency tables in the Guidelines, this was the equivalent of 663 grams of methamphetamine. Defendants do not challenge the inclusion of the quantity in the calculation of the total amount attributed to them.

Second, Officer Wenberg testified, based on his experience in investigations of drug trafficking, that the drug ledgers found in the pickup at the time of Defendants' arrest showed a quantity of 2014 grams. Defendants challenge this evidence on several grounds, but as explained below, we do not find it necessary to consider these issues. Third, Officer Wenberg testified that he included in his total estimate three pounds of methamphetamine, or 1356 grams, based on Judith Bauerlein's testimony at trial that Humphrey had borrowed her scales on three or four occasions to weigh one pound quantities. Defendants do not object to this portion of the total calculation.

Fourth, Officer Wenberg testified that his estimate included one pound, or 452 grams, based on Patty Bauerlein's testimony that she witnessed a transaction in a local

motel in June 1997. Defendants do not object to this quantity being included in the total estimate. Fifth, Officer Wenberg included six pounds, or 2,712 grams, based on information Patty had provided in the investigation phase concerning a transaction on July 4, 1997. Defendants challenge the inclusion of this amount, as discussed below.

Sixth, the total estimate included three ounces of methamphetamine, based on three occasions when Defendants sent $1,000 (each time) by wire transfer for the purchase of methamphetamine. Defendants do not challenge this part of the government's estimate. Finally, Officer Wenberg's estimate included 226 grams of methamphetamine, based on the almost $8,000 in cash found on Humphrey at the time of his arrest and in the search of the Dodge automobile in the garage at Patty's residence, as described above. Defendants do not challenge inclusion of this amount.

The government notes that the applicable Guidelines provision sets an offense level of 34 for any quantity of methamphetamine between three and ten kilograms. *See* USSG § 2D1.1(c) (1995). [15] Therefore, the government urges and we agree, any error in the estimate by Officer Wenberg must be harmless unless Defendants successfully challenge enough of the evidence to reduce the total to less than three kilograms. The quantities we have set out above which are not challenged on appeal total 2,773.75 grams. Therefore, to show prejudicial error Defendants would have to

---

[15]We note that the district court used the 1995 version of the Sentencing Guidelines because the crimes of conviction were committed before the effective date of the 1997 Guidelines, which increased the penalties for crimes involving methamphetamine by adjusting the drug quantity table in USSG § 2D1.1(c).

convince us that the district judge erred in attributing more than 226.25 grams in total to them on the basis of the challenged evidence. We find that Defendants' effort must fail.

We find it necessary only to address one contested point in order to resolve Defendants' challenge. As noted, Officer Wenberg included six pounds based on a transaction which occurred on July 4, 1997. The government candidly admits that the source of the six pound estimate is uncertain. Officer Wenberg testified that he believed that Patty Bauerlein had given this information during the investigation. At trial, however, Patty had testified that she could not recall the amount involved in that particular transaction, but that she did recall that on or near that date a large group of people came to the house on Jefferson Street and went into the bedroom that had been Mr. Bauerlein's. IX R. 677-81. She went into the room after the others had left and saw foil wrapped packages, one of which was opened and appeared to be methamphetamine. She also said that Humphrey told her that it was "crank," a slang term for methamphetamine, and "[t]hat it was a lot in terms of pounds." *Id*. at 680.

Assuming *arguendo* that this testimony was insufficient to prove by a preponderance of the evidence that the transaction involved six pounds of methamphetamine, we must agree with the government that any error would be harmless because the evidence was clearly sufficient to support an estimate of at least one pound. Given the amount of the drug attributed to Defendants that they have not

challenged, as set out above, we must conclude that any errors in the drug quantity calculation were harmless, as in any event the unchallenged evidence, plus one pound attributed to the July 4, 1997, transaction, is sufficient to establish the threshold quantity of three kilograms on which Defendants' offense levels were based.

**B**

Both Defendants challenge the enhancement of their offense levels under USSG § 2D1.1(b)(1) for possession of a dangerous weapon. [16] "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1, comment. (n.3). The initial burden is on the government to prove possession of the weapon by a preponderance of the evidence, which may be satisfied by showing "mere proximity to the offense." *United States v. Smith*, 131 F.3d 1392, 1400 (10th Cir. 1997). After the government has met this burden, a defendant can still avoid the enhancement if he can prove that it is clearly improbable that the weapon was connected to the offense. *Id.* Because Regan has been convicted of conspiracy, the straightforward application of the Guidelines provision authorizes the increase in offense level even if the gun was actually possessed only by Humphrey; in a drug conspiracy conviction the adjustment should be applied unless it is clearly improbable that the weapon was connected with the conspiracy offense. *United States v. Goddard*, 929 F.2d 546, 548 (10th Cir. 1991).

---

[16]Subsection (b)(1) of USSG § 2D1.1 provides: "If a dangerous weapon (including a firearm) was possessed, increase by **2** levels."

This enhancement was based on the pistol which was found in the trunk of the Dodge automobile parked in the garage at Patty Bauerlein's residence when the search warrant was executed hours after Defendants' arrest. Patty Bauerlein had testified that the Defendants had been gone for several days, having asked her to watch the house on Jefferson Street while they went out of town to buy drugs. Patty testified that they returned on September 5, 1997, arriving at her residence in the Dodge. The prosecution had already shown that the Dodge was registered to Humphrey. Patty testified that on arriving at her home, the Defendants took some things out of the Dodge, including some methamphetamine. Later, Defendants took the methamphetamine with them when they left with Patty in the Dodge, eventually returning to Patty's house with the Dodge, which was parked in the garage, and Humphrey's pickup. IX R. 684-95. These were the events relevant to the Dodge occurring just before the Defendants' arrest and the subsequent search of the vehicle.

In sentencing Regan, the district court found that:

> [I]t stretches credulity . . . to think that this defendant did not know that a loaded gun was available for the purposes of protecting the integrity of their drug purchases and sales. . . . .
> And the evidence is clear that this defendant had a longstanding relationship with the co-defendant. It is clearly foreseeable to the defendant . . . that he possessed a firearm in relation to the distribution of controlled substances.

XVIII R. 61.

At Humphrey's sentencing, which followed immediately after Regan's, the

-39-

judge referenced that finding and added that the gun "was available for the continuation of the drug trafficking offenses. It was present during portions of the conspiracy certainly. It is not clearly improbable that the gun was . . . connected to the conspiracy, and to the contrary it was connected to the conspiracy, and the enhancement is entirely appropriate." XVII R. 34-35.

Humphrey's argument emphasizes the requirement of physical proximity and the fact that his arrest occurred miles away from Patty's garage, where the loaded pistol was found in the trunk of the Dodge. This argument is without merit. The trial court properly found that the gun was connected to the conspiracy. Although no drugs were found in the trunk of the Dodge, other items connected with the conspiracy were, including the drug ledgers discussed above. Clearly, Patty Bauerlein's testimony, which the trial judge accepted, tied the Dodge to a drug buying trip which was completed only one day before the gun was found in the car's trunk. We cannot say that the district judge's findings were clearly erroneous. The government's evidence was sufficient to meet its burden, and Humphrey introduced no evidence to show that it was improbable that the gun was connected to the conspiracy.

Regan's argument emphasizes the lack of a direct connection between her and the weapon. She contends that in the absence of evidence that she had actual knowledge of the gun, the enhancement could not be properly applied to her. We

disagree. The issue is whether Humphrey's possession of the weapon in connection with the conspiracy was reasonably foreseeable to Regan. Regan contends that this case is similar to *United States v. Cochran*, 14 F.3d 1128, 1131-33 (6th Cir. 1994), in which the application of the dangerous weapon increase was reversed on appeal. The case is not helpful to Regan, however. In that case, the defendant Cochran had accompanied his cousin on a trip to buy drugs. When they were arrested on their return journey, a gun was found under the car seat where the other defendant had been sitting. The defendant testified at sentencing that although he knew the purpose of the trip and had purchased methamphetamine from his cousin on a regular basis, he knew nothing about the gun and did not believe that his cousin would carry a gun in connection with his drug trafficking because he was such a small time dealer. He also testified that he knew his cousin sometimes carried up to $1,000 when buying drugs.

Here the relationship between these Defendants was much closer than that between Mr. Cochran and his cousin. Accordingly, we do not find that the district judge here committed clear error in finding that Humphrey's possession of the weapon in connection with the trafficking activities was reasonably foreseeable to Regan. The district court did not err in adjusting the offense levels of both Defendants under USSG § 2D1.1(b)(1).

## C

Finally, we consider Defendant Humphrey's contention that the district judge

improperly increased his offense level for the use of a minor, Judith Bauerlein, to commit the offenses. The applicable Guidelines provision states: "If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase [the offense level] by **2** levels." USSG §3B1.4 (1995). A defendant may be found to have used or have attempted to use a minor within the meaning of this provision by "directing, commanding, encouraging, intimidating, counseling, training, processing, recruiting, or soliciting." *Id.*, comment. (n.1). And, of course, we are confined to considering conduct of "directing, commanding, encouraging," etc., "to commit the offense," and this means *Humphrey's* offenses he was convicted of, *his* conspiracy to possess methamphetamines with intent to distribute and *his* possession with intent to distribute, *not* Judith's acts in her own distribution conduct that was proven.

The district court made the following findings in rejecting Humphrey's challenge to this enhancement:

> [T]he evidence is clear to the Court that this defendant and his co-conspirator used or attempted to use a person of less than 18 years of age either to commit an offense or assist in avoiding its detection. It's reprehensible that a 14-year-old girl was used at least in some of the sales of methamphetamine in this case. . . . . Living with two adults who made methamphetamine available to her – and her testimony is believable, and I think it is – in turn she made drugs available to other children in this city. This adjustment for role in the offense is clearly appropriate.

XVII R. 35-36. As with other Guidelines issues, we will review the district court's findings of fact only for clear error, giving due deference to the district court's application of the Guidelines to the facts. *See, e.g., United States v. Smith*, 131 F.3d 1392, 1399 (10th Cir. 1997).

Our review of the record reveals no basis for the findings that Judith Bauerlein "was used at least in some of the sales" and distributed to other juveniles drugs provided by Defendants, and the government makes little attempt to defend the enhancement on this basis. Instead, the evidence was that Judith, who was using methamphetamine very heavily from the spring of 1997 until her arrest in mid-August of that year, had her own illegal methamphetamine business which was substantially, if not totally, independent of the trafficking activities of the Defendants.

According to Judith's testimony, which was not contradicted by any other witness, she sold only methamphetamine that she obtained from other sources, mostly other juveniles, IX R. 570-71; there is no indication that those juveniles were also customers of the Defendants. Judith testified that she was selling methamphetamine in ounce quantities and would have several thousand dollars worth of methamphetamine on hand at times, a fact she did not disclose to Defendants. *Id.* at 604. She also had thousands of dollars in cash on hand at times, unknown to Defendants. *Id.* at 607. She was able to keep her business to herself because she lived in the basement of the house on Jefferson Street and didn't allow the others in

her room. Defendant Humphrey was unable to stop her from carrying on her activities. *Id.* As to Defendants' activities, Judith denied ever witnessing any drug sales. *Id.* at 583.

It is true, however, that Defendant Humphrey engaged in methamphetamine *use* with Judith. IX R. 581-83. Judith testified that she sometimes shared the drug with the Defendants. As she described it, this would occur if she had methamphetamine but the Defendants did not, or the other way round. Whoever had some would share with the others, but Judith said that other than on these occasions when she was using methamphetamine with the Defendants, she did not obtain any of her methamphetamine from the Defendants.

Without confronting this evidence that Judith ran her own methamphetamine enterprise from the basement of the house, and that the Defendants' trafficking had no direct connection to Judith, the government defends the offense level increase by pointing to the evidence of Humphrey's use of methamphetamine with Judith and her testimony that he borrowed her scales on at least three occasions to weigh his methamphetamine, apparently in preparation for his sales of the substance. This proof is insufficient to support a finding that Humphrey used Judith in connection with *his* drug trafficking activities. The few instances of shared drug use described in Judith's testimony were not shown to have any relation to the large volume drug business that Humphrey was engaged in. To the contrary, Judith's testimony provided no basis for

finding that Humphrey involved her in his activities, except for borrowing her scales. This is not sufficient to constitute "use" of a minor. [17] There is no evidence of Humphrey "directing, commanding, encouraging, intimidating, counseling, training, processing, recruiting, or soliciting" Judith for the crimes of which Humphrey himself was convicted. In sum, subsequent sentencing proceedings must be in accordance with our rulings in this opinion.

## Conclusion

The cases of both Defendants are remanded for further proceedings in accordance with this opinion.

---

[17] We do not hold that a defendant's act of borrowing a minor's scales or other drug-related paraphernalia can never support application of the "use of a minor" enhancement. For example, if a defendant specifically requests a minor's permission to use scales for weighing drugs, such a request may constitute "soliciting" a minor to commit the offense. We need not decide whether that situation would justify the enhancement, however, because in this case there was no evidence indicating that Humphrey asked Judith's permission to borrow the scales. She merely testified that Humphrey did use her scales in her presence.

99-8001, 99-8002, *United States v. Humphrey and Regan*

**MURPHY**, Circuit Judge, dissenting.

I dissent from the majority's conclusion that the district court failed to adequately investigate the possibility of juror impropriety. The majority properly employs an abuse of discretion standard in reviewing the district court's decision to circumscribe its investigation in the manner it did. *See* Majority Op. at 10; *United States v. Davis*, 60 F.3d 1479, 1483 (10th Cir. 1995). I further agree with the majority that when an allegation of jury taint arises, the district court is obligated to "'investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated.'" Majority Op. at 10 (quoting *United States v. Rigsby*, 45 F.3d 120, 125 (6th Cir. 1995)). I diverge from the majority, however, in its determination that the district court in this particular case abused its discretion in ending the investigation at the conclusion of the evidentiary hearing on August 10, 1998.

The district court did not conclude its investigation of the allegation of juror impropriety until it held two separate hearings at which it heard testimony both from the juror who alleged the misconduct, Juror #1, and from the jury foreperson. After those two evidentiary hearings, the district court judge made a credibility determination that the foreperson, who denied the alleged improper comment was made, was more believable than Juror #1. The majority concludes that the district

court erred in ending its investigation at that point, because it should have at least examined two more witnesses–Juror #3, who may have spoken with Juror #1 about the purported comment during a cigarette break, and Juror #2, the alleged source of the improper comment. *See* Majority Op. at 13-15.

I fail to see why the district court should have considered Juror #3's testimony more important than that of any other juror, except the foreperson and Jurors #1 and #2, as the majority opinion suggests. During the first evidentiary hearing, at which all counsel had an opportunity to question her, Juror #1 never testified that she spoke about the purported comment with Juror #3; that claim was made only in the letter which Regan's attorney wrote alerting the court to the possible jury taint. [1] Juror #1 merely testified that Juror #2 made two improper comments before the *entire jury* and that following the second comment, the foreperson "straightened [Juror #2] right out." The district court, therefore, had no evidence before it indicating that an examination of Juror #3 would be more fruitful than questioning any of the nine remaining jurors who may have heard the comment and who were not called to testify.

Because the only evidence before the district court was that improper

---

[1] Despite having the opportunity to question Juror #1, neither defense counsel asked any questions about Juror #1's alleged conversation with Juror #3. If, as the majority believes, that alleged conversation is important to establish the necessity of examining Juror #3, it seems defense counsel would have examined Juror #1 concerning the purported conversation.

comments were uttered to the entire jury, the logical extension of the majority's mandate that the district court examine Juror #3 is to require trial courts to examine *all jurors* whenever there is evidence of an impropriety in the presence of the entire jury. We should refrain from imposing such a burdensome requirement on trial courts and instead allow them to exercise discretion in determining the necessary scope of an investigation into alleged jury taint, as the district court in this case properly did. Furthermore, regardless of how many more jurors a district court examines, when faced with conflicting testimony at some point it will need to make a credibility determination to resolve whether an improper comment was in fact made. The district court judge in the instant case, having worked closely with these particular jurors, was in the best position to ascertain when it could confidently make that credibility determination.

I further disagree with the majority's conclusion that the district court erred in failing to question Juror #2, the person who allegedly made the improper comment. The majority states that Juror #2's testimony is "critical" to determine whether the defendants' constitutional right to a fair trial was violated. Majority Op. at 13. The majority's assessment of the value of Juror #2's testimony, however, overlooks the position which the attorneys for each defendant took during the second hearing. After the examination of the foreperson was completed, the district court solicited comments from all the attorneys, to which the attorney for defendant Regan

responded,

> Your honor, I think that at this point certainly it's looking more speculative. I'd ask the Court to – to attempt to find [Juror #3]. He seems like the other person who would either confirm or deny what [Juror #1] said and continue it *for that particular purpose only and limited purpose only*.

(emphasis added) The attorney for defendant Humphrey similarly stated, "Nothing to add other than [Juror #3] has become important, and I guess I'd be interested to see what he has to say, either personally or through you. But that's all – that's all I'd add." Neither attorney, therefore, even requested an examination of Juror #2, though they had an opportunity to do so when the judge solicited their comments both before and after ruling. [2] Because the defense attorneys themselves apparently did not deem Juror #2's testimony either sufficiently helpful or necessary to warrant a request for her examination, I cannot accept the majority's characterization of this testimony as "critical." For the same reasons, I cannot conclude the district court's failure to call Juror #2 for questioning was error.

Quite independent of the majority's characterization of the testimony of Juror #2, defendants' failure to request an examination of Juror #2 constitutes a waiver of their right to challenge on appeal the district court's failure to call that juror for questioning. *Cf. Robinson v. Maruffi*, 895 F.2d 649, 657-58 (10th Cir. 1990)

---

[2] The majority apparently deems it important "that at the August 10, 1998 hearing, counsel for Humphrey favored calling Juror #3 for questioning." Majority Op. at 13 n.5. It should be equally significant that defense counsel did not similarly favor or request calling Juror #2.

(plaintiff could not appeal his inability to cross-examine a witness who was temporarily dismissed during direct examination when the plaintiff failed to object to the temporary excusal and later agreed to a permanent excusal); *Fitzpatrick v. Board of Educ.*, 578 F.2d 858, 860-61 (10th Cir. 1978) (concluding plaintiffs waived right to call certain witnesses even though they had reserved that right earlier in the trial, because they failed to raise the issue at the end of the trial when the judge asked if they were prepared to rest). Among the many difficult tasks of a district judge is addressing challenges to jury verdicts. In fulfilling that obligation, a district court should consider and be able to rely upon the suggestions of the very counsel challenging the verdict. The majority opinion fails to attach any significance to the role of counsel, whose views, suggestions, and advocacy, unimpeded by the rigors of trial, did not propose what the majority now orders.

In short, given the circumstances of this particular case, the specific evidence before the district court after two investigatory hearings, and the conduct of the defendants' attorneys, I disagree with the majority's conclusion that the district court here abused its discretion in terminating its investigation of the possible jury taint, rather than proceeding to question more jurors.