**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**August 5, 2005**

**PATRICK FISHER**
**Clerk**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | Nos. 01-8047 & 01-8084 |
| | (D. Wyoming) |
| CARLTON HUMPHREY, | (D.Ct. No. 97-CR-104-01-D) |
| Defendant - Appellant. | |

**ORDER AND JUDGMENT**[1]

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **O'BRIEN**, Circuit Judge.

This case is before us for a third time,[2] this time on remand from the United States Supreme Court for further consideration in light of *United States v. Booker,* -- U.S.--, 125 S.Ct. 738 (2005). *See United States v. Humphrey,* -- U.S.--, 125 S.Ct. 1043 (2005).

Convicted of drug trafficking, Carlton Humphrey contends the district court committed

---

[1]This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[2] *See United States v. Humphrey*, Nos. 01-8047 & 01-8084, 2004 WL 1059794 (10th Cir. May 12, 2004) (unpublished decision) (*Humphrey II*); *United States v. Humphrey*, 208 F.3d 1190 (10th Cir. 2000) (*Humphrey I*).

constitutional *Booker* error when it enhanced his sentence based on its findings that his relevant conduct involved 7.5 kilograms of methamphetamine and that he possessed a dangerous weapon in connection with the offense. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we again AFFIRM.

## I. FACTUAL BACKGROUND

We recount the pertinent facts of the case as stated in *Humphrey I*.[3]

> In the spring of 1997, Alvin Bauerlein was terminally ill with cancer. Mr. Bauerlein lived on Jefferson Street in Casper, Wyoming, with his then fourteen year old daughter, Judith. Nancy Regan also lived in his home, where she took care of Mr. Bauerlein and did cooking and housekeeping. Carlton Humphrey, a friend of Regan, stayed at the house at times and was a frequent visitor. One Yno Martin, a friend of Judith, also lived in the house for a few months in the summer of 1997, staying in the basement with Judith. Patricia Harris (later Patricia Bauerlein), known as Patty, became acquainted with Alvin Bauerlein through a cancer support group. Patty also eventually came to stay in the house on Jefferson Street.

> In late May of 1997, Mr. Bauerlein was gravely ill and in the hospital. On May 29 Alvin and Patty were married in the hospital room. Patty then moved into the house on Jefferson Street, where she lived for a few weeks. Alvin Bauerlein died five days after the marriage. A few days after that, Regan was appointed Judith's guardian.

> Judith Bauerlein had begun using methamphetamine in January or

---

[3] As the court in *Humphrey I* stated in prefacing its statement of the facts:

The following summary of the trial evidence is, for the most part, taken in the light most favorable to the jury verdicts; at times, however, points raised by the defense will be mentioned to provide context for the analysis which follows, even though the jury was not convinced by the defense evidence.

*Humphrey I* at 208 F.3d at 1195.

February, 1997. Testifying for the prosecution at trial, Judith said that she had been dealing methamphetamine during 1997, often having several thousand dollars in cash or several ounces of methamphetamine at a time. In mid-August, 1997 Judith was arrested and confined in a juvenile facility. Sometime in August Patty Bauerlein contacted Chuck Davis, who was an investigator with the Natrona County Sheriff's Department. Patty asked Davis to meet her at her mother's residence, where she had been living since late July, and he did so. Patty told Davis that [] Regan and Humphrey were dealing methamphetamine and that she wanted to put a stop to it because they were involving Judith in their activities. Patty continued to contact Davis about once a week for the following few weeks.

In late August, 1997 Patty contacted Davis with a specific tip. She said that Humphrey and Regan were going to Cheyenne to make a drug buy and gave a particular location where she believed they could be found. Officers in Cheyenne were unable to locate [Humphrey and Regan] that day, and Patty testified that she later learned [they] had gone to Denver instead of Cheyenne that day. On September 5 Patty again called Davis and reported that Humphrey had a large amount of methamphetamine in his possession and was in Casper, probably driving a green pickup. Officers were unable to find Humphrey that night.

On the morning of September 6, 1997 Patty called Davis again. She said that she and Judith were to meet Humphrey and Regan for breakfast at the Flying J truck stop in Casper. Several officers gathered near the truck stop and spotted [Humphrey and Regan] leaving in Humphrey's green pickup. By this time, the police had determined that the pickup was registered to Humphrey, that he was driving under suspension, and that there was an outstanding warrant for his arrest. Police stopped the pickup with Humphrey and Regan in it after it left the truck stop. As the pickup was slowing down and pulling over, police saw defendant Regan ducking down and moving as if she were moving something on the floorboard of the pickup. When Humphrey produced his identification he was arrested on the outstanding warrant. He was handcuffed and placed in a patrol car. The officers searched Humphrey's pockets and found $3,492 in cash, as well as a money order for $500.

While Humphrey was being arrested and searched, another officer asked Regan to get out of the pickup and talked with her. In the meantime, other officers found a tan satchel [on] the floor of the pickup on the

passenger side. Opening the satchel, they found two large bags containing what they believed to be, and what was later proven to be, methamphetamine totaling over 600 grams. Regan was then arrested. Subsequent search revealed a small quantity of methamphetamine, about 3 grams, in her purse . . . . She had only a small amount of cash. The pickup was impounded and taken to the police station, where it was thoroughly searched. Small additional amounts of drugs were found, along with some drug paraphernalia.

Patty had also told Davis that Humphrey had left his Dodge automobile in the garage at Patty's mother's house, where she was staying. Immediately after the arrest of [Humphrey and Regan], the officers sought a search warrant for the Dodge. Patty, Judith, and Yno Martin had witnessed the arrests. They went from there to Patty's mother's house, where they destroyed small amounts of drugs, and Judith removed some photos from the Dodge. About forty- five minutes later, officers arrived to secure the location pending issuance of the requested search warrant.

The warrant was issued and the Dodge was searched later that day. The trunk of the car contained, *inter alia*, another $4,000 in cash, a loaded pistol, and a notebook with handwritten numbers and notations. The notebook was admitted in evidence at trial, and was said in expert testimony to be a drug ledger. Patty Bauerlein identified the handwriting in the notebook as that of [] Regan.

*Humphrey I,* 208 F.3d at 1195-97. With respect to the Dodge automobile left at the

residence where Patricia Bauerlein was staying and later searched:

Patty Bauerlein had testified that [Humphrey and Regan] had been gone for several days, having asked her to watch the house on Jefferson Street while they went out of town to buy drugs. Patty testified that they returned on September 5, 1997, arriving at her residence in the Dodge. The prosecution had already shown that the Dodge was registered to Humphrey. Patty testified that on arriving at her home, [Humphrey and Regan] took some things out of the Dodge, including some methamphetamine. Later, [Humphrey and Regan] took the methamphetamine with them when they left with Patty in the Dodge, eventually returning to Patty's house with the Dodge, which was parked in the garage, and Humphrey's pickup.

-4-

*Id.* at 1210-11.

## II. PROCEDURAL BACKGROUND

On January 30, 1998, a jury convicted Humphrey and his co-defendant, Nancy Regan, of conspiracy to possess methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846 (Count I), and possession with intent to distribute methamphetamine (and aiding and abetting the same) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2 (Count II). *See Humphrey I*, 208 F.3d at 1195. The jury, however, made no quantity determination. *See* USSG §2D1.1(c) (providing base offense levels according to drug quantity). Nor did it find Humphrey possessed a dangerous weapon in connection with the offenses. *See* USSG §2D1.1(b)(1) (providing a two level enhancement for possession of a dangerous weapon in connection with an offense). Instead, the court made these two determinations at sentencing on December 15, 1998.[4] Based on its finding that Humphrey's relevant conduct involved the equivalent of 7,692 kilograms of marijuana (which included 7.5 kilograms of methamphetamine), the court calculated a base offense level of 34 under §2D1.1(c)(3).[5]

---

[4] The presentence investigation report (PIR) and the court applied the November 1, 1995 edition of the *Guidelines Manual* issued by the United States Sentencing Commission. Unless otherwise noted, all references to the guidelines are to the 1995 edition.

[5] In addition to the 7.5 kilograms of methamphetamine, the PIR and the evidence at sentencing indicated Humphrey's relevant conduct included amounts of amphetamine and cocaine. Because more than one substance was involved in the offense, all amounts were converted to their marijuana equivalencies for purposes of determining the base offense level under USSG §2D1.1(c). *See* USSG §2D1.1, comment. (n.10 "Drug Equivalency

It then increased the base offense level by two levels under §2D1.1(b)(1) based on its finding that Humphrey possessed a dangerous weapon in connection with the offense. The court also added two levels under USSG §3B1.4 for the use of a minor in commission of the offense. With a criminal history category of III and a total offense level of 38, the applicable guideline range was 292 to 365 months imprisonment for each count. The court sentenced Humphrey under 21 U.S.C. § 841(b)(1)(B), a quantity enhanced penalty provision,[6] to 304 months on each count, to run concurrently.

On appeal, we upheld the district court's drug quantity determination and its application of the dangerous weapon enhancement but found error in the court's imposition of the two-level enhancement under USSG §3B1.4 for use of a minor in commission of the offense. We vacated Humphrey's sentence and remanded for further proceedings. *See Humphrey I*, 208 F.3d at 1210-11, 1213. The district court resentenced Humphrey on October 4, 2001. It stood by its earlier findings as to drug quantity and possession of a dangerous weapon and eliminated the §3B1.4 enhancement from its calculation of the total offense level. With a revised total offense level of 36 and a criminal history category of III, the applicable guideline range was 235 to 293 months. The court finessed the Supreme Court's intervening decision in *Apprendi v. New Jersey,*

---

Tables").

[6] 21 U.S.C. § 841(b)(1)(B)(viii) provides for a penalty of not less than five years and not more than forty years imprisonment in a case involving 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine.

-6-

530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") by resentencing Humphrey under the non-quantity enhanced penalty provision contained in 21 U.S.C. § 841(b)(1)(C).[7] *See Humphrey II*, 2004 WL 1059794 at **4 n.11. It sentenced Humphrey to 240 months imprisonment on Count I and to 48 months imprisonment on Count II, to run consecutively. *See* USSG §5G1.2(d) (providing for consecutive sentences under defined circumstances). We affirmed. *See Humphrey II.* On remand from the Supreme Court following the grant of his petition for writ of certiorari, *see Humphrey,* 125 S.Ct. 1043, Humphrey challenges his sentence on the ground the district court's findings relative to drug quantity and the dangerous weapon enhancement violate *Booker*. We ordered supplemental briefing to address the impact of *Booker* on Humphrey's appeal.

## III. DISCUSSION

### A. *Standard of Review*

In *Booker*, the Court extended its ruling in *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531 (2004) (invalidating Washington's sentencing guidelines under the Sixth Amendment)[8] to invalidate the federal sentencing guidelines insofar as they were

---

[7] 21 U.S.C. § 841(b)(1)(C) provides for a penalty of not more than twenty years imprisonment in a case where no specific quantity of controlled substance is established for schedule I or II controlled substances.

[8] In *Blakely*, the Court applied its decision in *Apprendi,* 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond

mandatory. 125 S.Ct. at 745. The Court held that "[a]ny fact (other than a prior

conviction) which is necessary to support a sentence exceeding the maximum authorized

by the facts established by a plea of guilty or a jury verdict must be admitted by the

defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. The Court

concluded the guidelines would not offend the Constitution if advisory only. *Id.* at 749-

50. To this end, in the remedial portion of its opinion, the Court excised those provisions

mandating application of the guidelines. *Id.* at 756-57. The Court indicated its decision

was applicable to all cases, like this one, on direct review. *Id.* at 769.

Applying *Booker,* we have stated:

[T]here are two distinct types of error that a court sentencing prior to *Booker* could make. First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. As a matter of convenience, we will refer to such an error as a constitutional *Booker* error. Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. While this type of sentence does not violate the Sixth Amendment, such a sentence is nonetheless

---

the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") to invalidate Washington's sentencing guidelines under the Sixth Amendment. In *Blakely*, the sentencing court enhanced a standard sentence based on facts neither admitted by the defendant nor proven to a jury beyond a reasonable doubt. Even though the enhanced sentence did not exceed the statutory ceiling of imprisonment for the offense, the Court invalidated it. *Blakely,* 124 S.Ct. at 2538. In doing so, the Court clarified that "the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 2537 (quotation marks and emphasis omitted).

impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines. We will refer to this second type of error as a non-constitutional *Booker* error.

*United States v. Gonzalez-Huerta,* 403 F.3d 727, 731-32 (10th Cir. 2005) (en banc) (quotation marks and citations omitted). Irrespective of the type of error involved, *Booker* does not necessitate a remand for resentencing in all instances. Instead, "reviewing courts [are] to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the plain-error test." *Booker,* 125 S.Ct. at 769 (quotation marks omitted).

Indubitably, the district court in this case committed constitutional *Booker* error when it enhanced Humphrey's sentence based on its findings that Humphrey's relevant conduct involved 7.5 kilograms of methamphetamine and that he possessed a dangerous weapon in connection with the offense. The Government concedes the point. The parties differ, however, as to whether we ought to review for harmless or plain error. Humphrey contends he preserved a *Booker* claim by raising an *Apprendi* objection at his resentencing on October 4, 2001. At that time, Humphrey argued, correctly, that *Apprendi* limited the court's statutory sentencing authority to a maximum of 240 months on each count. He also contended *Apprendi*, along with USSG §5G1.2(d) (providing for consecutive sentences under defined circumstances), required concurrent sentences. Significantly, Humphrey did not object to his sentence on the ground it was unconstitutional for the district court to find, by a preponderance of the evidence, the

facts necessary to support either its drug quantity or its weapon enhancement for its calculation of his offense level under the guidelines. Thus, *United States v. Windrix,* 405 F.3d 1146, 1158 (10th Cir. 2005) (*Booker* claim preserved by *Apprendi* objection to judge-found facts to support offense level enhancements), and *United States v. Riccardi,* 405 F.3d 852, 874 (10th Cir. 2005) (accord), which Humphrey cites in support of his argument for harmless error review, are inapposite. While *Booker* is certainly distant progeny of *Apprendi,* merely citing *Apprendi* in an objection that is not directed to the unconstitutional practice identified in *Booker* (enhancing a sentence based on judicial fact-finding pursuant to a mandatory guideline scheme) is insufficient to preserve a *Booker* objection. Thus, we review Humphrey's *Booker* claim for plain error.

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta,* 403 F.3d at 732 (internal quotation marks omitted). "We conduct this analysis less rigidly when reviewing a potential constitutional error." *United States v. Dazey,* 403 F.3d 1147, 1174 (10th Cir. 2005) (internal quotation marks omitted). On the other hand, we enjoy discretion to notice plain error. *See* FED. R. CRIM. P. 52(b). In this case, there is no doubt the error is plain, and as a result, the first two prongs of the plain error test are satisfied. *See United States v. Clifton,* 406 F.3d 1173, 1181 (10th Cir. 2005) ("Non-constitutional and constitutional *Booker* errors satisfy the first two prongs of the plain-error test."). We thus limit our

-10-

review to the third and, if necessary, the fourth prong of the plain error test.

### B. Third Prong – Substantial Rights

"Satisfying the third prong of plain-error review--that the error affects substantial rights--usually means that the error must have affected the outcome of the district court proceedings." *Gonzalez-Huerta,* 403 F.3d at 732 (internal quotation marks omitted). It is the defendant's burden to make this showing, even in a case of alleged constitutional error. *Id.* at 733. "To meet this burden, the appellant must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted).

> In a case of constitutional *Booker* error, there are at least two ways a defendant can make this showing. First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected his substantial rights. This inquiry requires the appellate court to review the evidence submitted at the sentencing hearing and the factual basis for any objection the defendant may have made to the facts on which the sentence was predicated. Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range.

*Dazey,* 403 F.3d at 1175 (footnotes omitted).

1. Whether jury would have found facts applying a reasonable doubt standard

We first inquire whether there is a reasonable probability a jury, applying a beyond a reasonable doubt standard, would not have found, as did the court applying a

preponderance of the evidence standard, that Humphrey's relevant conduct involved 7.5

kilograms of methamphetamine and that he possessed a dangerous weapon in connection

with the offense.

### *Drug Quantity*

At sentencing on December 15, 1998, the district court applied a base offense level

of 34 based on Humphrey's relevant conduct,[9] which included 7.5 kilograms of

_____

[9] Application Note 12 to the commentary of USSG §2D1.1 provides:

Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* §1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant[.]

USSG §1B1.3(a) provides in part:

Unless otherwise specified (I) the base offense level where the guideline specifies more than one base offense level . . . shall be determined on the basis of the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully cause by the defendant; and

       (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

methamphetamine. *See* USSG §2D1.1(c)(3) (base offense level of 34 applies if offense involves at least three kilograms but less than ten kilograms of methamphetamine). In so concluding, the court relied on both the PIR and the testimony of Officer Chris Wenberg of the Casper Police Department, lead officer in the case. In his testimony, Officer Wenberg broke down the 7.5 kilograms (7,500 grams) of methampetamine as follows: (1) 655.17 grams seized from Humphrey's pickup when he was arrested, (2) 2,014.10 grams extrapolated from a drug ledger found later the same day in the trunk of Humphrey's Dodge automobile, (3) 1,356 grams which Judith Bauerlein testified she observed Humphrey weigh on a triple beam scale he borrowed from her, (4) 452 grams which Patricia Bauerlein testified she observed Humphrey purchase in June 1997, (5) 2,712 grams (six pounds) which Patricia Bauerlein claimed to have observed in Humphrey's possession on July 4, 1997, (6) 84.75 grams which Patricia Bauerlein testified Humphrey purchased via three wire transfers to Colorado, and (7) 226 grams extrapolated from nearly $8,000 in cash (including a $500.00 money order) seized from Humphrey's vehicles on the day of his arrest.

---

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]

-13-

In brief cross-examination, Humphrey's counsel challenged Officer Wenberg's testimony concerning the 2,712 grams Patricia Bauerlein claimed to have observed in Humphrey's possession on July 4, 1997. He drew an admission from the officer that Patricia Bauerlein never testified to this effect at trial, notwithstanding efforts by the Government to elicit such testimony. Instead, according to Officer Wenberg, Bauerlein only made the statement to the Government in an interview before trial. Counsel also established that Officer Wenberg had not submitted the drug ledger for expert handwriting analysis, nor did he have personal knowledge as to who made the entries in the ledger. However, apart from challenging the two amounts included in Officer Wenberg's total calculation, as just described, counsel declined to call any witnesses or offer any rebuttal argument to the Government's claim that Humphrey's relevant conduct involved 7.5 kilograms of methamphetamine.[10]

In his supplemental brief, Humphrey questions the credibility of the Government's witnesses.

> A review of the record provides no indication whether the jury, in any manner, believed the testimony of Patricia Bauerlein or any other government witness. Appellant was arrested with a bag containing approximately one pound of methamphetamine in his vehicle. Based on this evidence alone, it is not unrealistic to think the jury could convict Humphrey, without putting any stock in the testimony of Patricia Bauerlein

---

[10] Prior to sentencing, in a letter to the United States Probation Office dated March 27, 1998, Humphrey objected to the PIR's calculation of relevant conduct quantity on the ground that only the methamphetamine seized in his vehicle when he was arrested (655.17 grams) should be used in the calculation.

or any other witnesses proferred by the government.

(Appellant Supp. Br. at 9-10.)  In particular, Humphrey challenges the reliability of

Patricia Bauerlein's testimony as it relates to the identification of the handwritten entries

in the drug ledger and the alleged six pound methamphetamine transaction she claimed to

have witnessed on July 4, 1997.

We are not persuaded by Humphrey's arguments.  First, his challenge to the

credibility of the Government's witnesses is, for the most part, conclusory.  Second, his

claim the jury might have convicted Humphrey based solely on his arrest and possession

of 655.17 grams of methamphetamine fails to take into account that in addition to a

conviction for possession with intent to distribute methamphetamine, Humphrey was also

convicted, along with co-defendant Regan, of conspiracy to possess methamphetamine

with intent to distribute.  Our review of the record convinces us the testimony of the

Government's witnesses, particularly that of Patricia Bauerlein, was both persuasive to

the jury and essential to the conspiracy conviction.

Third, we adopt our reasoning in *Humphrey I*, in which Humphrey argued the

district court's drug quantity determination was clearly erroneous, specifically its

inclusion of the 2,014.10 grams extrapolated from the drug ledger and the 2,712 grams

(six pounds) which Patricia Bauerlein claimed to have observed in Humphrey's

possession on July 4, 1997.[11] Even excluding from the total calculation the 2,014.10 grams extrapolated from the drug ledger, we noted in *Humphrey I* that the evidence presented at trial was sufficient to establish that Humphrey possessed at least one pound (453.6 grams[12]) of methamphetamine on July 4, 1997:

> The government candidly admits that the source of the six pound estimate is uncertain. Officer Wenberg testified that he believed that Patty Bauerlein had given this information during the investigation. At trial, however, Patty had testified that she could not recall the amount involved in that particular transaction, but that she did recall that on or near that date a large group of people came to the house on Jefferson Street and went into the bedroom that had been Mr. Bauerlein's. She went into the room after the others had left and saw foil wrapped packages, one of which was opened and appeared to be methamphetamine. She also said that Humphrey told her that it was "crank," a slang term for methamphetamine, and "[t]hat it was a lot in terms of *pounds*."

*Id.* at 1210 (record references omitted) (emphasis added). "[T]he unchallenged evidence, plus one pound attributed to the July 4, 1997, transaction, is sufficient to establish the threshold quantity of three kilograms on which Defendants' offense levels were based." *Id.* *See* USSG §2D1.1(c)(3) (base offense level of 34 if offense involves at least three kilograms but less than ten kilograms of methamphetamine). The court's reasoning enjoys no less resonance in our *Booker* analysis.

For the foregoing reasons, and after a careful review of the entire record, we conclude there is not a reasonable probability a jury, applying a beyond a reasonable

---

[11] Humphrey did not challenge the remaining amounts included in Officer Wenberg's total calculation of 7,500.02 grams. *See Humphrey I*, 208 F.3d at 1209.

[12] *See* USSG §2D1.1, comment. (n.10 "Drug Equivalency Tables").

doubt standard, would not have found, as did the court applying a preponderance of the evidence standard, that Humphrey's relevant conduct included at least three kilograms of methamphetamine.

### *Possession of a Dangerous Weapon*

The court enhanced Humphrey's base offense level two levels for possession of a dangerous weapon in connection with the offense. *See* USSG §2D1.1(b)(1) ("If a dangerous weapon (including a firearm) was possessed, increase by 2 levels). The commentary to the guideline provides that "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG §2D1.1, comment. (n.3). "'Offense' means the offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." USSG §1B1.1, comment. (n.1(H)).

At the sentencing hearing on December 15, 1998, Officer Wenberg testified that a loaded Ruger .22 caliber revolver was seized from the trunk of Humphrey's Dodge automobile at the same time the drug ledger was seized. Humphrey's counsel did not cross-examine Officer Wenberg on his weapon testimony; nor, as noted in our drug quantity discussion, did he call any witnesses. He confined his objection to the weapon enhancement to a perfunctory argument that the weapon was not connected to the offense

by virtue of the fact that it was not seized from Humphrey or his pickup at the time of his arrest. In his supplemental brief, Humphrey repeats this objection and adds, as he did with respect to the quantity enhancement, that the Government's witnesses were not credible. He also claims three of the witnesses, Judith Bauerlein, Patricia Bauerlein and Yno Martin had the opportunity to plant the weapon in his vehicle.

We need not repeat our discussion of the credibility of the Government's witnesses. As to whether Judith Bauerlein, Patricia Bauerlein or Yno Martin planted the weapon in Humphrey's vehicle, the proposition lacks evidentiary support. The key issue in the application of the enhancement is the connection of the weapon with the offense. Again, we rely on our reasoning in *Humphrey I.* In addition to the fact the Dodge automobile was registered to Humphrey, and

> [a]lthough no drugs were found in the trunk of the Dodge, other items connected with the conspiracy were, including the drug ledgers discussed above. Clearly, Patty Bauerlein's testimony . . . tied the Dodge to a drug buying trip which was completed only one day before the gun was found in the car's trunk.

*Humphrey I*, 208 F.3d at 1211. "The government's evidence was sufficient to meet its burden, and Humphrey introduced no evidence to show that it was improbable that the gun was connected to the conspiracy." *Id.* For like reasons, we conclude there is not a reasonable probability a jury, applying a beyond a reasonable doubt standard, would not have found, as did the court applying a preponderance of the evidence standard, that Humphrey possessed a dangerous weapon in connection with the offense.

-18-

2.       <u>Whether the district court would reasonably impose a sentence outside the guidelines range if analyzed under the sentencing factors of 18 U.S.C. § 3553(a)</u>

Nor has Humphrey met his burden to demonstrate a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a),[13] the district court would have reasonably imposed a sentence outside the

---

[13]    **Factors to be considered in imposing sentence**. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed –

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for –

guideline range under a post-*Booker* advisory regime. The court's comments in rendering

sentence evidence the contrary:

> I understand that you have a drug addiction, and that alone warrants the Court's determination that I will not go to the high end of the guideline as the United States has requested, but that doesn't mitigate your conduct. That doesn't absolve you from really what was a very active life of crime involving thousands of dollars of drugs in this community.
>
> . . .
>
> I'll say to you I have often said that I thought the guidelines that a court has to impose during a sentencing of a criminal sentence in a drug case are Draconian, far beyond what is necessary; but once in a while there comes a case where it seems to me that the guidelines are just about right, and sadly for you, Mr. Humphrey, my conclusion is that this is one of those cases.

(01-8047 R. Vol. 5 at 43.) When he was resentenced, the court amplified on its earlier

comments:

---

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission . . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

It is apparent from the history, this defendant has made a living as a drug dealer at least for some time in his life. Prior to his apprehension, there is nothing really that would suggest that he would attempt to withdraw from this kind of a life-style and criminal activity. He's participated in substance abuse treatments, I think, on two occasions and failed. [The] Court recognizes that this individual is probably in the drug trade to support his habit, but the fact of the matter is he's become a menace to society and shouldn't be overlooked. Drugs were found in the car in which he was traveling on the day he was arrested. Sentence on the low end of the guideline would seem imprudent.

(01-8084 R. Vol. 19 at 11.) We identify no evidence in the record to counterbalance the court's comments or to suggest it would have sentenced differently in the absence of the provision mandating application of the guidelines.

## IV. CONCLUSION

Based on the above, we conclude the constitutional *Booker* error at sentencing did not affect Humphrey's substantial rights under the third prong of the plain error test. This being so, we need not consider whether he satisfies the fourth prong of the test. We determine Humphrey has failed to satisfy the plain error test. Accordingly, we REINSTATE our prior decision in *Humphrey II* and AFFIRM Humphrey's sentence.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge